Ladies and gentlemen, please rise. This court is now in session. You may be seated. This court will call the next case. Ms. Burla, you may proceed. Ms. Burla Good morning, your honors, counsel. May it please the court, as this court is aware, we have raised two issues in the brief. I do plan on trying to touch on both of those today as time permits. And I will begin with our first issue. In this modern digital age, one thing all of us fear, or most of us fear, is an unpopular opinion or stupid thing we do being caught on social media and displayed for the public. Reaching what is deemed by the public as the wrong result in a criminal trial is the type of activity that could incite public criticism and humiliation and invade the jury's personal life as well. The case before this court was an emotionally charged trial where the jury was tasked with deliberating Davion Nickerson's guilt in delivering drugs that caused the death of another young woman in the community. In that context, it was undisputed that people in the gallery were filming the trial on their phones. It is also undisputed that this filming was so concerning to the jurors that they sent a note to the trial court during deliberations asking why that filming had occurred. That note, in turn, was concerning enough to the court that it stopped deliberations for the day. It told the jury to go home, said it would have an answer for them in short order the next day. At that time, both parties, the state and defense counsel, recognized there was at least a possibility that this note might indicate that this jury was no longer able to fairly deliberate this case. But the court wanted time to research and the state wanted time to research as well, so they went home for the night. The next morning, when the parties appeared, what happened was they confirmed, in fact, there was at least one person filming in the trial. It had been a taller white man in the courtroom. They also confirmed the parties said they could not locate that man, so they could not obtain his phone and destroy the recording, which is what the court said would typically happen had the court seen that. However, despite the fact that the jury's concerns were validated, or the jury's observations were validated, the court never asked any questions to the jurors to ascertain whether they could still be fair or even gave them an answer on why the filming had occurred. It simply issued a note telling them to continue to deliberate, focus only on the evidence in the law, and that its concerns were being addressed. The trial court's failure, as defense counsel requested, to engage in questioning with the jurors as to whether they could still be fair was a denial of the right to a fair and impartial jury trial. Of course, whether to question jurors depends on the facts and circumstances of each case. However, as the numerous cases cited in the opening brief show, generally the trial court's view of jury questioning is kind of the starting point in how to proceed from here, whether there needs to be a mistrial, whether the trial can continue. In fact, this court held in Walker that answers from jurors on whether they can be fair following a potentially prejudicial event is very important to consider. The facts and circumstances of this case certainly warranted questioning. Regarding the facts, the unusual event and improper event of a spectator in the courtroom filming the proceedings was a concerning enough event that it could potentially cause prejudice. As defense counsel told the trial court, certainly no one, no juror, that would be their fear, would have their name displayed on social media as having been a juror and reached this outcome. Alternatively, the jurors could think that this person was close to one of the parties and was trying to intimidate them or at least was going to be able to take their identity, their face, outside of the courtroom. There were certainly many possibilities on what the jury asked or was feeling. In the exercise of the raising of this issue, you agree that this is a discretionary decision by the trial court, right? Yes. And the record here shows that the trial court, as you said, broke for the day, did the research overnight, invited both counsel to provide their input, and then the next morning made the determination after doing the research, getting the input, not to question the jurors. How is that not an exercise of their discretion, even though that does not support your position? The exercise of discretion was she did, not to question. I believe it was an abuse of the court's discretion in that regard, and I would note the primary case that the court relied on was something that was very dissimilar to the facts of this case. The court was primarily relying on this play beverages versus playboy case, but that case is very different from this case. There, there was no note ever actually sent by the jury. It had so happened that when three of the jurors were leaving the courtroom, they asked the clerk, we're concerned about security. Is there a private way out? Some of the spectators in the courtroom have intimidated us. Very much unlike this case, there was absolutely no evidence that any of the spectators had done anything improper. This was just something going on in these jurors' heads. They wanted a private way out. So the reviewing court found on appeal that in that case where there had been no note from the jurors, it might truly invite fear and concern where none existed by questioning the jurors about whether they were afraid of something in the courtroom. They were afraid of these spectators. Here, the jury had already to stop their own deliberations. In fact, they'd already asked another question more about the facts of the case. But then even farther into deliberations, this jury note comes up that says, why were people filming in the courtroom? Showing that it really mattered to these jurors enough to be discussed in deliberations. So for that reason, that case relied on by the trial court, but the less is more policy was what it felt was something that was just very different. And I think the closer case is People v. Llewellyn, which is another First Sister case. And there, a state witness had testified during testimony that he'd refused to appear for a subpoena because he was afraid of the defendant. And subsequent to that, the jury sent out several notes that said, what are the jurors' safety concerns? Should we be afraid too? We're concerned that the defendant has our names on paper. And again, like this case, the court adjourned for the evening while they could figure out what to do. The next morning, though, the court came back and decided to question the jurors. And that questioning was very informative because it ultimately showed it was really only one juror who had been concerned in that case. And he was kind of the source of that note. All 11 of the other jurors said they could still be fair. But this one juror said, I can't be fair. And so the court removed him, replaced him with an alternate, was able to ensure a fair trial. So on appeal, the First Sister said that that was the correct thing for the trial court to do, noting that it would be a different question altogether had that questioning not occurred. In this case, the questions which the jurors asked, and I realize that you're speculating that, A, the jurors did it during deliberations because they feared something, safety, whatever, or that they feared potentially being placed on some social media site and they feared that. But this question is ambiguous at best. I mean, for the judge to go either route in considering that they were fearful for their physical safety or fearful for their social media safety, I mean, she weighed that, apparently, and decided, no, I don't want to open up that can of worms because I could make it worse rather than better. And that's a recognition they had the discretion. And your argument is, well, they abused it because almost in every instance they have to question the jurors. I think it's the unique facts and circumstances of this case. And the trial court was repeatedly saying, I'm speculating that I know what they're thinking. The only way to find out what they were thinking was to question them. And this was a concerning enough event, a very unique set of facts, the juror noticing the court, the filming in the courtroom, and the very fact that they asked that question during deliberations. It wasn't something that the parties in the trial court had noticed on their own and thought we better check to make sure the jury didn't see this. This was something the jurors specifically tried to engage with the trial court. Why was there filming? So the trial court could have certainly engaged in, you know, they could have tailored the questions to the jurors in a certain way. You ask this note, what were the reasons behind you asking the note? And then they could say, well, I noticed this and I felt this. There didn't have to be any deliberate, are you intimidated now, to kind of lead them. I think this was such a unique circumstance that, as even the state acknowledged on the very first day, this might be an indication that they can't be fair. I don't know, without getting into what the reasons for asking are, that the question was very important in this case. Because certainly, if they were afraid of issuing a bad verdict or they were afraid of someone in the courtroom, that could affect their ability to be fair. And that is something that, you know, the ability to be fair is of paramount importance to a juror. So does that answer? Thank you. Does this court have any questions, other questions about the first issue? Well, I guess my question is, if we follow your line of reasoning, then will we be required to say that when there is an ambiguous question that requires follow-up questions by the judge? I don't think so. I think this was just, it's the unique fact of this circumstance. Something that everyone said was improper. The court said, had I seen this phone in the courtroom, I could have told them to stop. And the defense counsel said, yes, then you can tell the jury there's no concern. But this very thing of improper event occurring that could potentially be prejudicial, that in this unique case, it was warranted. And especially because the jury issued that note during deliberations and relatively well into their deliberations. Thank you. If this court does not grant Nickerson a new trial, it should find that his 18-year sentence is excessive and either reduce that sentence to a more proportionate term or remand for a new sentencing hearing. The Illinois Constitution requires that punishments be proportionate to the offense and include a rehabilitative aim. The legislature has determined that for the offense of drug-induced homicide, 6 to 30 years is appropriate. There was nothing particularly aggravating about the facts of this case or the nature of this offense to justify a 12-year increase over the minimum. At the same time, there were an abundance of mitigating factors supporting a sentence closer to the minimum. For example, Nickerson was very young at the time of this offense, only a few months past his 21st birthday. Nickerson had a particularly rough childhood, growing up in an impoverished community without a father and in a home where his mother was working all the time, so she was not able to be with him as much as Nickerson would have been able to like since childhood. He had suffered mental health problems as a child so severe that he was hospitalized for a period of time, initially placed on medication. By the age of 14, he was resorting to stealing food, clothes, and basic necessities just to sustain himself. He began consuming alcohol regularly and marijuana daily at the age of 15. By the age of 18, he was addicted to ecstasy, Percocet, and Xanax. He dropped out of high school during his senior year, never obtained his GED, and was unable to find employment at any of the places where he filed job applications. Notably, despite all of the problems that Nickerson faced, he never joined a gang. He has no history of violent crimes whatsoever. But in the circumstances that he faced, being a high school dropout in an impoverished community, not able to find a legal job, what he saw were that the people in his community doing well were those who sold drugs. And then at the age of 18, Nickerson candidly admitted to the probation officer, this all comes from him, he decided at that point that he would try to sell drugs as well. At that age, Nickerson was still very young, susceptible to negative influences and peer pressure, and it was unfortunately that fateful event that led him to the very tragic events of this case. And Ms. Moreland, the record does reflect that the court took into consideration all those negative factors, correct? Yes. And equally took into consideration aggravating factors that you've not mentioned, correct? Right. There is some instances, though, where the trial court would say, I do acknowledge this, but I can give you some quotes, I do have compassion for you insofar as the upbringing you had, and that wasn't fair to you. But you're not a kid now, and you did something that has caused pain to the people that you love. With the upbringing that you had, I would expect a few more pages in the PSI of things you had done where you had more involvement with the criminal justice system. But I can't change the fact that you were found guilty of an offense and it resulted in the death. So the court was acknowledging these factors, but then it was repeatedly saying, I hear them, but, and also it's not reflected in the harsh sentence imposed. And the only aggravating factors cited by the court were, I see my time is getting close, his prior, the fact that, although it did not find he had a prior criminal history that was aggregating, it was the fact that he had been involved in drugs for these past few years. And I just think it's so telling that Nickerson himself was the one who was forthcoming about that to the probation officer and said, yeah, this is what led me to this. I see now what happened. I see how this is hurting my family. And then he also apologized in court and took responsibility. And the only other aggravating factors cited by the court was deterrence. But again, you can consider those aggravating factors, and maybe they warrant a sentence somewhere over the minimum, but this was 12 years over the minimum for this. He only had this one prior conviction that occurred around the same time as this, with all of this mitigating evidence. It can only hinder him to stay in prison for so long, an additional amount of time, among hardened criminals, hinder his efforts toward rehabilitation. He does now have a relationship with his father again, who has a restaurant in Peoria, and can hire him. He has three children who were living with Nickerson and their mother, either at the time of offense or at least by sentencing. I think the youngest was born between that time. So he has so much motivation to rehabilitate his life. Given that this is his first prison sentence ever, never even a probation sentence, even a sentence closer to the minimum could have significant impact on him. So for those reasons, if this court does not reverse Nickerson's conviction, we would ask for this court to remand or to reduce his sentence. Is there a question? Thank you, Ms. Borland. Mr. Cunningham, you may proceed. Good morning, Your Honors. Counsel, good morning. You know, at its core, this case is very simple. This was a young woman who was addicted to drugs. It's a common story. She bought some drugs. She called her drug dealer or texted him a dozen times in just over an hour and a half. He showed up. She got the drugs. And a short time later, she was dead. And that's why we're here today. The jury found that this defendant had committed the crime of homicide. Now, what defense is arguing now on the first issue is that the court failed to exercise its discretion. Now, we've got to go back to what the standard is on a review here. And I know the court's aware the trial court abuses its discretion when it either fails to understand that it had that discretion or it fails to exercise that discretion. And Justice Doherty already pointed out, this court not only recognized it, on page 470 of the record it says, and it is within my discretion, and I am very concerned that if we start inquiring, it's going to be a bigger problem than it is at the moment. In addition, I would say there's no evidence the person using the phone was threatening towards them or attempted to influence their decision in any way. In other words, this court not only knew it had discretion, but it thought about the stuff it needed to think about. As Justice Doherty pointed out, when it first got this note, what did it do? It called the attorneys in. It read the note. It said, okay, what do you think? And the defense attorney says, well, I think I need to ask for a mistrial, but I'm not sure exactly. It wasn't on point with it. The state said, hey, I'd like to, I think this, but I don't know. I need to research this. So the court, considering the time of day it was, the defense correctly points out that the court stopped the proceedings, but it was 430 in the afternoon. The judge indicated that they were about to stop proceedings anyway, so why don't we stop these proceedings, give you both a chance to go out and investigate this, look up the law, do what you need to do, come back in the morning, and we'll discuss it. And that's exactly what they did. They came back the next morning. The judge asked for their input and got their input, and both of them discussed with all the people that they could whether or not there was any filming going on, and as far as they know, they couldn't come up with it. The defense now says that it's undisputed there was somebody filming. We still don't know that. All we know is that maybe somebody was sitting with their arms folded and a phone stuck in it, like maybe they were filming, but we don't know that. The defense also claims that the judge never answered the question of why were they filming, but it's an unanswerable question, really. We don't know who was filming or whether or not they were filming, so it's impossible to answer. So the judge had to do the best she could with what she had, and she decided after listening to both sides and reviewing all the cases, the Flayboy case, the Runge case, as well as three other cases that she cited, and she says, you know what, if I bring them out here and I start asking questions, it might just create a problem where there isn't one, so here's what I'll do. I'll send a note back saying, hey, listen, we understand your concern. We're dealing with it. Move on with what you've got to do, which is decide what the facts are and apply the law that I gave you, and that's what the jury did, and she reiterated. The judge says, I mean, they didn't say they were worried. They didn't say they've been influenced. They didn't say we're scared. They didn't ask for additional accommodations. They just said why. So it's my inclination that based upon these questions that it's answered, that it comes from the court's attention, it's come to the court's attention, it's been addressed and continued to deliberate, and she later says, the court has considered the circumstances that occurred yesterday, and the court has real concerns as exercising its judicial discretion that if we bring them out, we're going to call more attention to it than is necessary. I realize the defendant doesn't like the decision she made, but the question here on review is, did she recognize she had discretion, and did she exercise it? She clearly recognized she had discretion, and she says, I'm exercising my discretion in choosing not to voir dire these jurors any further, and I'm not sure how long we can beat this up, but it's pretty clear here, you know, the jury had the chance, and the other thing that hasn't been brought up is that if the jury wasn't happy with the note they sent back, then clearly they'd already sent out two notes. If they were still unsatisfied or weren't in fear in some way, they had the opportunity to send out another note and say, John, if you don't understand, we're afraid. We think this guy may be doing something. They didn't do that. They just continued to deliberate as they were instructed, and they came back with a verdict. Does the court have any questions on that issue? No, we don't have a question. Okay. Now, on the second issue, the defendant correctly points out that this class 6 felony that our legislators decided that 6 to 30 years is the proper range. The defendant seems to believe that we start at the minimum of 6 and work our way up as we find factors that mitigate it up. The fact is, at trial, the defendant asked for 8 to 9 years. The state asked for 25 years. The court came back with about 18 years, and she said that she had considered everything she was required to consider. In fact, she considered the pre-sentencing investigation report, the evidence, the arguments, the victim impact statements, the defendant's statement of allocution, defendant's history and character, and all of the statutory factors in aggravation and mitigation. She came out, she said all that. How much more can you do to show and create a record that says, well, I'm considering everything I'm supposed to consider. And then the sentence itself, while true, it is 3 times the minimum. If you take the minimum of 6, yes, it's 3 times that, but it's also right dead in the middle of what that sentence could have been. And the fact is, you know, as terrible it is for this guy who's going to have to spend a decade or more in prison, the fact is, with this current sentence, at about his mid-30s, he's going to get out and he's going to get a second chance at life. He's got time to, he still has a chance, if he chooses to, to have some kind of relationship with his children. It will be limited because of where he is, but he can still have that. He can get out, he can get an education, and he will have a chance. Tara Colvin is not going to climb out of that grave in 15 years and be able to have a second chance. And that's, you know, we commit crimes in this country, and that's sometimes you have to pay. And the judge wasn't trying to be, she wasn't laying down any kind of retribution on this guy. She recognized that, okay, I realize, you haven't been arrested a bunch of times, I might have expected that. But the fact is, the defendant, by his own admission, as I just said, at 18, all he did was sell drugs for three years and four months until this event. So the only thing that stopped him was him being incarcerated. He never had one day of lawful employment, not one day at a Walmart, at a Wendy's, anything. He couldn't find one job. All he ever did was sell drugs. The fact that he hardly got caught, I don't know that he gets credit for that when sentencing. I think the judge properly looked at all the factors she was supposed to look at. She laid them out for the court to understand what was going on, and she reached a fair sentence. So unless there's any further questions, for these reasons the State would ask that you affirm the judgment. Thank you. Thank you, Mr. Cunningham. Ms. Borland for rebuttal. Thank you, Your Honors. First, addressing the first issue, I would like to say in the reply brief we did cite several cases where courts have held that the failure to ask questions or to meaningfully ask questions is itself an abuse of discretion that requires a new trial. So it's not just that the court exercises discretion and says, okay, should I ask questions or should I not, and that's enough to find discretion. In these cases, for example, one of them was the People v. Cain, a 1969 Illinois Supreme Court case. There, there had been a newspaper article kind of attacking something defense counsel had done in court outside of the presence of the jury, and one of the jurors read it, and the court brought that juror in, but it asked very leading questions or incomplete questions. So the Illinois Supreme Court said, your questioning did not allow for that single juror to actually reveal whether they could still be fair, and that was enough to create a new trial. And there are several more cases cited in our reply brief, United States v. Vasquez-Riez and Jones, that further support the proposition that the failure to ask questions can be an abuse of discretion. And regarding the courts' discretion in this case, I think it's so interesting that the initial question for the trial court that these parties were considering is whether there should be a mistrial in this case. That's what everyone went home this first day. Do we have to give a mistrial? And then to come back the next day and just do nothing, short of telling the jurors, your concerns are being addressed, continue to deliberate. That's such a far cry from where the court was, when there was this middle ground of asking the jurors this. And as these cases show, most of the time, these questions don't cause the jurors to fear any prejudice, where they don't have it. They can be honest. And I think these jurors are invested in the case, and they want to reach a verdict, so they're not just trying to get out of anything. It's just such a crucial question of asking these jurors, can you still be fair? And regarding the fact that the jury did not send out a second note, asking again, you never answered our question, the court's note to them was very dismissive. They'd done what they could here. Why was there filming in the courtroom? The court says, I'll give you a short answer on that tomorrow in short order. He never gave the answer. He just sent them back the note, continue to deliberate, focus only on the evidence and the law, and your concerns are being addressed. There was no need for them to answer. Ask another question in that regard. I wanted to touch briefly on People v. Runge and the fact that the court found no abuse of discretion in that case. In that case, what was happening was there was some jury misconduct going on back in the courtroom, and the court did bring in Juror A, who was the one engaged in all this misconduct, for individual questioning, and he was ultimately removed. The court then also, because this Juror B was reporting on all of Juror A's misconduct, brought in Juror B and said, what is kind of going on here? And she said, I'm concerned that there might be some other stuff going on with these jurors, too, because the other jurors, because Juror A has been talking to them. So the court then brought out all of the jurors, the trial court did, and said, I've given you this instruction not to prematurely deliberate this case, and can any of you no longer follow that directive? And everyone agreed that they could. What the defendant contended on appeal is that there should have been individual questioning as well. And the court said, no, there was no need for that. The Illinois Supreme Court said that. For one thing, Juror B reported on this, but also engaging into this individual questioning could, is sort of, in that case, it was about you jurors doing anything improper yourself. Have you, juror, prematurely discussed this case? That goes into the internal workings of the mind and the jury's deliberations, which are not proper for questioning. That makes this case much different from this case, which is about an external event, wholly unrelated to the jurors. You saw this filming. Are you still going to be okay to deliberate this trial? I think that's all I had on the first issue. On the sentencing issue, I think I've discussed most of everything in opening. But regarding the fact that he could not find employment, or he did not have a job, he tried to find employment. He was unable to find employment with any of his job applications. He was a high school dropout, and he did make this decision, which, again, he candidly admitted to the probation officer to get into selling drugs at the age of 18, when he lived on the streets, had been stealing stuff to sustain himself. And I don't think it's fair to just say he could have gone out and got a regular job. And, again, he had realized by this time that he had to change his ways, and he understood that. So unless this Court has any questions? No questions. Thank you. Thank you, Ms. Borland. Thank you both. Your arguments for today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible.